**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **PAUL J. MANAFORT, JR.,** | : | |
| | : | |
| *Defendant* | : | |
| | : | |
| **IN RE:** | : | **Case No. 1:18-mc-00167** |
| **PETITIONS FOR RELIEF CONCERNING** | : | |
| **CONSENT ORDER OF FORFEITURE** | : | **Judge Amy B. Jackson** |
| | : | |
| | : | |
| **WOODLAWN, LLC,** | : | |
| | : | |
| *Petitioner* | : | |
| | : | |

**WOODLAWN, LLC'S REPLY IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO
THE SPECIAL COUNSEL'S MOTION FOR DISCOVERY UNDER RULE 56(d)**

Petitioner Woodlawn, LLC, by undersigned counsel, makes this unified reply to the Special
Counsel's Opposition to Woodlawn's motion for summary judgment, and in Opposition to the
Special Counsel's Motion for Discovery.

1.      **Preliminary Statement**

This Court should grant Woodlawn's motion for summary judgment without first
authorizing the Special Counsel to take discovery which would serve no purpose other than to
delay the inevitable and greatly run up Woodlawn's attorney fees and litigation costs. The Special
Counsel's filing (Docs. 55 through 55-4) is misleading and/or frivolous on many levels. Because
the Special Counsel has demanded to see documentary evidence that (1) the loan amounts were

1

actually disbursed by Woodlawn to the Manaforts, and (2) the amount of payments Woodlawn received from the Manaforts on the Note, we are providing such documents now. Please see Exhibits 1 and 2 attached to this Reply. That production satisfies the only legitimate request for evidence the Special Counsel makes. Exhibit 1 is a bank statement from attorney Keith Berglund's IOLTA account at Chase in Los Angeles. It shows the wire transfers adding up to $1,025,000 going from Woodlawn's attorney to the Manaforts' escrow agent and their attorney Bruce E. Baldinger.  Exhibit 2, the Declaration of Keith Berglund, has a list of all eleven payments from the Manaforts to Woodlawn and several copies of the checks that were used to make the payments.

The Special Counsel adverts to the fact  (Doc. 55-1 at 11) that *Woodlawn offered to provide the SCO with whatever documents were in its possession* conditioned only upon a pledge by the SCO to keep the identity of the principal in Woodlawn confidential unless ordered by a court to make his identity public. Indeed, Woodlawn's counsel even offered to sit down with Mr. Claman, walk him through the documents in Woodlawn's possession and answer any questions he had about the loan. The only condition Woodlawn placed on this generous provision of informal discovery was that the SCO enter into some kind of confidentiality agreement or agreed protective order to keep the identity of the person who provided the loan money for Woodlawn, LLC. Counsel explained that the individual was a U.S. citizen residing in Southern California, where President Trump is highly unpopular. It is well known that friendships and other relationships have shattered over political views in our current "tribal" society. Mr. Claman and undersigned counsel had a few amicable conversations about how to draft a confidentiality agreement or protective order but, in the end, the SCO decided that it would not enter into *any* such agreement, regardless of the terms. Counsel still does not know why the SCO made that wrongheaded decision. This left

2

Woodlawn with no choice but to move for summary judgment, as undersigned counsel told Mr. Claman he would do if no confidentiality agreement could be had.

Given this background and Woodlawn's willingness to show and tell the SCO everything it wanted to know, it is frustrating to read the SCO's statement that Woodlawn "refused the government's requests for informal discovery" (Doc. 55-2 at 2) and that months of intensive, extensive and very expensive discovery—including no less than *nine depositions*—"is *necessary* to enable the government fully to respond to Petitioner's Motion for Summary Judgment and is *desirable* to resolve factual issues raised by Woodlawn's Petition." Doc. 55 at 1 (emphasis added). The SCO quotes the discretionary language of Fed. R. Crim. P. 32.2(c)(1)(B). But it is neither "necessary" nor "desirable" for the Court to exercise its discretion at this time to allow *any* discovery in this ancillary proceeding, much less the grossly disproportionate, burdensome and expensive amount and type of discovery sought by the SCO. That is particularly clear with respect to Woodlawn's first claim under § 853(n)(6)(A), which does not turn on what Woodlawn or its principal knew or should have known at the time the loan was made. Since the *first* claim does not raise genuine issues of material fact, there is no reason for the Court to grant discovery on Woodlawn's *second*, alternative claim, under § 853(n)(6)(B), the bona fide purchaser exemption from forfeiture. If and when the Court denies summary judgment on Woodlawn's first claim, which Woodlawn does not expect, there will be ample time to consider arguments about what discovery, if any, the SCO should be allowed to pursue with respect to the second claim under § 853(n)(6)(B).

2. **The SCO's frivolous standing argument**

The SCO's Opposition is littered with misleading or unsupported arguments. One particularly groundless argument is that Woodlawn has not yet established its Article III standing

in this case. The SCO cites (Doc. 55-1 at 6) the correct "very forgiving" test for standing in a forfeiture case: "any colorable claim on the property suffices, if the claim of injury is redressable, at least in part, by a return of the property." *United States v. Emor*, 785 F.3d 671, 676 (D.C. Cir. 2015). So the SCO is arguing that Woodlawn hasn't presented "a colorable claim on the property." That is nonsensical on its face. "At the pleading stage, *Article III standing is something to be alleged, not proved*. All that must be alleged is an injury, personal to the person seeking judicial relief, that the court can redress…This is constitutional law 101." *United States v. Funds in the Amount of $574,840*, 719 F.3d 648, 651 (7th Cir. 2013) (emphasis added). Accord *United States v. $999,830.00 in United States Currency*, 704 F. 3d 1042, 1042-43 (9th Cir. 2012); *United States v. $31,000.00 in U.S. Currency*, 872 F.3d 342 (6th Cir. 2017); *see also United States v. Salti*, 579 F.3d 656, 667 (6th Cir. 2009) (at the motion to dismiss stage of ancillary hearing facts set forth in third party's petition "are assumed to be true" and must be construed in favor of petitioner). Incredibly, the SCO argues (Doc. 55-1 at 11) that Woodlawn must prove that it "is an entity distinct from the defendant" in order to establish standing. Under that novel test, no corporate third party petitioner would ever have standing until it proved that it is an entity distinct from the criminal defendant!

In sum, there is no reason to grant the SCO's request for "[u]p to 15 Special Interrogatories consistent with Rule G(6) of the Supplemental Rules…regarding the identity of Woodlawn and the extent and nature of its claims."[1] Doc. 55-4 at 2 (Proposed Order). Standing has been easily

---

[1] Rule G(6)(a) explicitly limits these special interrogatories "to the claimant's identity and relationship to the defendant property." It does not permit interrogatories regarding "the extent and nature of [the] claims." So, right from the start, the SCO is seeking to exceed the scope of Rule G(6), which is solely directed to questions relating to the claimant's standing; and Woodlawn's standing is not in doubt. Moreover, Rule G(1) specifically states that Rule G "governs a forfeiture action *in rem* arising from a federal statute." In other words, it governs federal civil forfeiture cases. It does not apply to criminal forfeiture ancillary proceedings, which are not *in rem* proceedings.

established already. These superfluous Special Interrogatories would be designed merely to harass Woodlawn and waste its money.[2] *See United States v. All Assets Held at Bank Julius Baer & Co., Ltd.*, 959 F. Supp. 2d 81, 101, 105-06 (D.D.C. 2013) (government, represented by Mr. Claman, raised "a veritable blizzard" of legal and factual arguments that claimant bank or its court-appointed liquidators, lacked standing, but "[w]hen the storm clears…it becomes evident that none of these arguments has merit"; 38 page opinion showing why each of the government's "blizzard" of standing arguments was "misleading" or otherwise utterly lacking in merit). "[T]he information sought in discovery is" certainly *not* "tailored to the nature of the [alleged] deficiencies in Woodlawn's Petition…" Doc. 55-1 at 16. Does the SCO really believe that nine depositions—most of which would have to take place in California—are "necessary" to satisfy itself that the loan agreement is not a sham concocted by Paul Manafort?

### 3.   The SCO's puzzling reliance on the Declaration of Sherine D. Ebadi

The SCO also fails to explain the relevance of Doc. 55-3, the 32 page Declaration of Sherine D. Ebadi, to Woodlawn's case. The SCO seems to be arguing that because Mr. Manafort apparently used a Cyprus shell company to purchase 1046 North Edgewood in Arlington, Virginia, there is reason to believe that he may have used Woodlawn to make a "sham" loan *to himself*. That is a preposterous theory, not supported by Agent Ebadi's declaration, which does not warrant any discovery by the SCO. If this theory had any factual support, would counsel have offered to give Mr. Claman all documents in Woodlawn's possession and to walk him through the documents?

---

[2] "Prosecutors routinely ignore the narrow limitations of the scope of discovery under Rule G(6)(a), still hoping to discourage claimants from contesting the forfeiture by making burdensome discovery demands at the outset of the case." 1 David B. Smith, *Prosecution and Defense of Forfeiture Cases*, ¶9.04[2][b], 9-70.37 n. 105 (Matthew Bender Sept. 2018 ed.).

**4.     Exhibits 1 and 2 prove beyond any reasonable doubt that the loan agreement was wholly legitimate and not a sham.**

In any event, the two attached exhibits prove beyond any reasonable doubt that the loan agreement was wholly legitimate, not a sham, and that "Woodlawn has a legitimate interest distinct from the defendant in the Baxter Street Property." Doc. 55-1 at 16.  Exhibit 1 is a bank statement from attorney Keith Berglund's IOLTA account at Chase in Los Angeles. It shows that on August 7, 2017, there was an incoming wire transfer from [redacted], LLC[3] in Santa Monica for $512,500. On August 10, three days later, the statement shows an outgoing wire transfer in the same amount to the Citibank account of First National Title Agency, LLC in New York. The August 10 wire entry references "123 Baxter St." Exhibit 1 also shows a second wire transfer on August 17, in the amount of $512,500 from [redacted], LLC in Santa Monica to attorney Berglund's IOLTA account at Chase. The total is $1,025,000—the exact amount of the loan to the Manaforts. On August 21, there is a second outgoing wire transfer in the amount of $506,841 from attorney Berglund's IOLTA account to a TD Bank account in the name of Law Offices of Bruce E. Baldinger (Attorney Trust Account) the Manaforts' attorney in the loan transaction.

Exhibit 2 is the Declaration of Keith Berglund. Attached to the declaration as Declaration Exhibit A is a handwritten list prepared by Mr. Berglund of the eleven payments Woodlawn received from the Manaforts, listing the date of each payment, beginning on August 22, 2017 and ending on November 21, 2017, and the account from which the payment was sent (all but one in the name of Kathleen Manafort, not Paul Manafort). The first payment is $3,159, on August 22, 2017 with the notation "1/2 months interest, directed from B. Baldinger." Exhibit 1, the Chase statement, shows an outgoing wire in the same amount, $3,159, going from Berglund's IOLTA

---

[3] In order to protect from public disclosure the identity of company—and thus the individual—that provided the loan money for Woodlawn, the company is herein referred to as "[redacted], LLC."

account to a Bank of America account in the name of [redacted], LLC. In other words, the interest payment from the Manaforts is being turned over to the entity that loaned the money through Woodlawn, which is another LLC in California. Woodlawn cannot identify the name of the LLC at this time, as that would reveal the name of the individual who provided the loan money, who wishes to remain anonymous *to the public*. Woodlawn will reveal that person's name and his LLC's name to the Court and the SCO when there is a protective order for his identity in place.

These facts are consistent with Woodlawn's Petition and its Motion for Summary Judgment and with everything counsel informally told Mr. Claman. Attached to Mr. Berglund's declaration as Exhibit B are copies of several of the checks from Mrs. Manafort to Woodlawn. Accordingly, there are no "factual issues as to whether the loan was a sham transaction" (Doc. 55-1 at 13)[4] and thus no need for the SCO to conduct formal discovery, at least with respect to Woodlawn's first claim, that under § 853(n)(6)(A). Denial of unnecessary and hugely burdensome and expensive discovery would hardly amount to the SCO being "railroaded" by Woodlawn (Doc. 55-1 at 9). *See United States v. On Leong Chinese Merchants Ass'n Bldg.*, 918 F.2d 1289, 1295 (7th Cir. 1990) ("Rule 56(f) [now 56 (d)] is not a shield that can be raised to block a motion for summary judgment without even the slightest showing by the opposing party that his opposition is meritorious.").

---

[4] The SCO's effort to generate a factual issue as to whether the loan was a sham is bootless, at least after considering Exhibits 1 and 2, attached. Even if we agreed with the SCO that there are "facial irregularities on the loan documentation," an "absence of information concerning the establishment of Woodlawn, the timing and duration of the loan, [and an] absence of any substantial effort to recover the loan amounts after the note matured" (Doc. 55-1 at 13), none of those alleged facts (which we reject) would suggest that "the loan was a sham transaction." *Id.* The loan is what it purports to be—an arms-length transaction on reasonable terms between parties that did not know each other before the loan agreement was negotiated.

5. **The earliest time the government's interest could vest or ripen in substitute property such as the Manaforts' residence at 123 Baxter Street is when an indictment alleging forfeiture was returned against the defendant, here Paul Manafort.**

Woodlawn's Motion for Summary Judgment at 7-8 provides a clear and concise explanation of what a petitioner must show in order to prove a claim under § 853(n)(6)(A). It is worth repeating that explanation here verbatim, particularly because the SCO fails to cite or discuss *any* of the nine cases Woodlawn relied on there.

Woodlawn's interest "was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant" (Mr. Manafort) prior to the time when the Baxter Street property became subject to forfeiture as a substitute asset.

According to the government's Motion for Consent Order of Forfeiture (Doc. 2, p.3), the Baxter Street residence is only subject to forfeiture as a substitute asset. Likewise, the Consent Order of Forfeiture (Doc. 3, p.3), lists the Baxter Street residence as "substitute property" under § 853(p). Unlike "tainted" property, the relation-back doctrine, codified in § 853(c), does not apply to substitute assets. *Luis v. United States*, 136 S. Ct. 1083, 1091-92 (2016) (§853 is limited to "tainted" property with the sole, limited exception of § 853(p)); *Honeycutt v. United States*, 137 S. Ct. 1626, 198 L. Ed. 2d 73, 84 (2017) (same); *United States v. Chamberlain*, 868 F.3d 290 (4th Cir. 2017) (*en banc*). Although the courts are still divided on *when* the government's interest in substitute property ripens or vests, there is broad agreement that the *earliest* time when the government's interest could vest in substitute property is when an indictment or information alleging forfeiture is returned. *E.g., United States v. Erpenbeck*, 682 F.3d 472, 477-78 (6th Cir. 2012) (Sutton, J.) ("The relation-back clause [of § 853(c)] extends only to tainted property— 'property described in subsection (a).'" Court holds that government does not have a "ripened interest" in substitute property until "(1) after the defendant's conviction and (2) the court

determines the [tainted] property is out of the government's reach for a reason enumerated in [§ 853(p)(1)]"); *United States v. Jarvis*, 499 F.3d 1196, 1204-05 (10th Cir. 2007) (same); *United States v. Espada*, 128 F. Supp. 3d 555, 561-65 (E.D.N.Y. 2015) (same, collecting cases).[5] Accordingly, Woodlawn's secured interest in the Baxter Street residence was not only superior to any right of the defendant at the time of the Note agreement but *also* superior to any later-ripening forfeiture interest of the government in the same substitute property. *See United States v. Watts*, 786 F.3d 152, 166 (2d Cir. 2015) ("a third party may prevail under § 853(n)(6)(A) only by establishing that he had a legal interest in the forfeited property before the government's interest vested.").

"[I]n criminal forfeiture proceedings conducted pursuant to 21 U.S.C. § 853(n), the Government 'stands in the defendant's shoes,' and a petitioner who establishes a legal interest in property superior to the defendant is entitled to recovery of its property. *United States v. Nektalov*, 440 F. Supp. 2d 287, 294-95 (S.D.N.Y. 2006), *aff'd*, *E.J.D. Diamond Manu. v. United States*, 273 Fed. App'x 65 (2d Cir. 2008)." *United States v. Egan*, 2011 U.S. Dist. LEXIS 84892, *18-19 (S.D.N.Y. Aug. 2, 2011).

The SCO relies on two isolated opinions, neither of which is correct, in an effort to create a *legal* issue—not a factual issue for which discovery would be needed. This Court can decide the *legal* issue on summary judgment without allowing discovery.

While recognizing that the relation-back doctrine "may not apply to substitute property," the Second Circuit panel held that "§ 853(n) (perhaps as a result of Congressional oversight)

---

[5] The cases collected in *Espada* show that, prior to Daugerdas, no court in the Second Circuit had held that the government's interest in substitute property could vest or ripen earlier than the time of the indictment. *See also* 2 David B. Smith, *Prosecution and Defense of Forfeiture Cases*, ¶13.02[4][d], 13-44.18 (Matthew Bender Sept. 2018 ed.).

effectively imposes the temporal limitations of the relation-back doctrine even on third-party claims to substitute assets. That provision does not distinguish between contested property initially forfeited as offense proceeds and property forfeited as substitute assets; instead, § 853(n)(6)(A) requires that the third party's interest in *any* forfeited property must have been superior to the defendant's 'at the time of the commission of the acts which gave rise to the forfeiture.'"   *United States v. Daugerdas*, 892 F.3d 545, 554 (2d Cir. 2018).

The Second Circuit panel's analysis is seriously flawed, however, because, among other reasons, it did not realize that the substitute asset provision, § 853(p), was not enacted until 1986, two years after the rest of § 853. That is why § 853(n)(6)(A) "does not distinguish between" tainted and untainted property—because untainted, substitute property was not yet subject to forfeiture in 1984 when § 853(n) was enacted. *Congress simply failed to amend § 853(n) when it enacted § 853(p).* This "Congressional oversight" is a thin reed for interpreting § 853(n)(6)(A) in a way that substantially negates the clear language of § 853(p)(2) limiting forfeiture of substitute property to the "property of the defendant" and would produce pernicious outcomes Congress plainly did not intend. If the defendant gratuitously transferred the untainted property to his disabled wife or his church or his favorite charity many years before he is charged with an offense, that property is not in any real sense the "property of the defendant" when it is ordered forfeited at or after he is sentenced, perhaps decades later. As Judge Posner has written, "issues that arise in litigation relating to the meaning or application of statutes often had not been foreseen by the enacting legislature. In such cases there is no intended legislative meaning to be recovered, thus compelling judges to play a lawmaking role—to become in effect ad hoc interstitial legislators." Richard A. Posner, *The Federal Judiciary* 17 (Harvard U. Press 2017).

The Second Circuit panel conceded that its conclusion conflicts with *all other* cases, including its own decision in *U.S. v. Watts*, 786 F.3d 152, 166 (2d Cir. 2015) ("a third party may prevail under § 853(n)(6)(A) only by establishing that he had a legal interest in the forfeited property before the government's interest vested."), and the Supreme Court's decision in *Luis v. U.S.*, 136 S. Ct. 1083, 1091 (2016), both of which it incorrectly dismissed as "dictum." 892 F.3d at 555-56 & n. 12. It recognized that the Sixth Circuit takes a fundamentally different approach in *U.S. v. Erpenbeck*, 682 F.3d 472, 478 (6th Cir. 2012), interpreting the word "acts" in § 853(n)(6)(A) as referring "to various acts of the government [that might cause the government's interest to vest], for example, when the government first tried and failed to collect tainted assets from the defendant." 892 F.3d at 555. The Sixth Circuit adopted the analysis of the Tenth Circuit, *U.S. v. Jarvis*, 499 F.3d 1196, 1204 (10th Cir. 2007) ("[T]he United States does not have a ripened interest in § 853(p) substitute property until (1) after the defendant's conviction and (2) the court determines the § 853(a) forfeitable property is out of the government's reach for a reason enumerated in § 853(p)(1)(A)-(E)."). So did several district courts within the Second Circuit. *See, e.g., U.S. v. Espada*, 128 F. Supp. 3d 555, 566 (E.D.N.Y. 2015) ("Until the government has satisfied [its] burden [under § 853(p)(1)] it plainly cannot acquire an interest in substitute property.").

*Daugerdas* does *not* take note of the Fourth Circuit's very different analysis in *U.S. v. Oregon*, 671 F.3d 484, 492 (4th Cir. 2012), holding that the inquiry whether a third party's interest was superior to that of the defendant "involves equitable considerations and is necessarily fact-bound and value-laden." The Fourth Circuit held that whether the third-party's interest was "vested" at the time of the illegal acts is merely one factor for the court to consider in balancing

the equities. 671 F.3d at 493. This flexible approach will lead to much fairer outcomes than *Daugerdas*.

The SCO also cites *United States v. Preston*, 123 F. Supp. 3d 117, 127-28 (D.D.C. 2015), as "instructive" but not controlling. Doc. 55-1 at 13. The SCO states (*id*. at 14) that, if the Court follows *Preston,* "a 21 U.S.C. § 853(n)(6)(A) claim is not available to Woodlawn because their 2017 lien was years after the 'acts which gave rise to forfeiture.'" That absurd and unjust result is an excellent argument for *not* following *Preston* (or *Daugerdas*). It would necessarily follow that none of the petitions filed by banks that the SCO has already recognized and settled should have been granted, at least not under § 853(n)(6)(A).

*Preston* has markedly different and much less favorable facts for the petitioner than this case. Since the district court ruled that Preston's petition "fails on all three grounds," 123 F. Supp. 3d at 129, it did not need to reach the issue that concerns us here. Nor is the court's analysis persuasive or even clear. *No other court* has ruled that the government's interest in an item of substitute property vests or ripens "when, as a result of any act or omission of the defendant, property subject to forfeiture under Section 853(a) meets one of five conditions [under Section 853(p)(1).]" 123 F. Supp. 3d at 127. It is not surprising that *Preston* stands alone in this regard. The test is unworkable as well as grossly unfair to innocent third parties by creating a hidden government forfeiture lien. How is any third party supposed to know when one of the five broadly written "conditions" under § 853(p)(1) has occurred, or could be viewed by prosecutors as having occurred, thus making *all* of the defendant's *untainted* assets *instantly* subject to forfeiture as substitute property with no notice to the world? This test would make it practically impossible for a defendant facing potential forfeiture of *some* of his property to sell, rent or pledge any of his clean, untainted property to raise money for living expenses or attorney fees or defense costs. It

might also allow the government to restrain substitute assets prior to trial, thus pauperizing the defendant. *Luis* and *Honeycutt* ended that terrible practice, which only existed in the Fourth Circuit. The SCO offers the Court no explanation of the *Preston* decision, nor could it justify *Preston*'s ruling on when the government's interest in substitute property vests or ripens.

### 6.    Woodlawn is also entitled to summary judgment as a BFP under § 853(n)(6)(B).

Contrary to the SCO (Doc. 55-1 at 15), Woodlawn has already "demonstrated that it acquired an interest in the Baxter Street Property through an arms-length transaction." See Woodlawn's Motion for Summary Judgment (Doc. 44 at 8-12). Contrary to the SCO's unreasonable fear, Woodlawn has already demonstrated that it did not "acquire[] its purported interest through a sham transaction or without providing anything of value." Doc. 55-1 at 16. Woodlawn has also convincingly shown that it *could not* have known, at the time it made the loan, that the Baxter Street property would, much later, be subjected to forfeiture as an untainted substitute asset belonging to Paul Manafort. Doc. 44 at 10. If it *could not* have known that, which is obvious, it is impossible to find that it "*should* have known" that. So it is immaterial what facts "Woodlawn and its representatives knew at the time it entered into the … loan agreement." Doc. 55-1 at 16. *Whatever* facts Woodlawn may have known, they could not possibly add up to sufficient knowledge to undermine its BFP claim, for the reasons stated in our Motion for Summary Judgment.

The SCO's very brief response on the BFP claim does not cite or discuss *any* of the numerous cases Woodlawn cited on this issue in its Motion for Summary Judgment.

The U.S. Response to Petitioner Woodlawn LLC's "Proposed Findings of Material Facts" (Doc. 60-1) does not require a detailed rejoinder. The SCO's signature block is not on Doc. 60 and 60-1 so we will henceforth refer to the "government" (here, the DoJ Criminal Division's MLARS

Section) rather than the SCO. The government's eleven pages of objections and responses are extremely repetitive and without any substance. They amount to mere table pounding in the absence of a real basis to challenge any of Woodlawn's Proposed Findings of Material Facts and the documents supporting them.

> **7.      The Court should deny or severely limit the SCO's Motion for Discovery. If it grants discovery, the Court should fashion a protective order to protect the individual who provided the loan money from having his identity publicly revealed.**

In 2015, the discovery rules were revised to emphasize that "proportionality" must be considered when allowing or limiting discovery. Rule 26(b)(1) now provides that discovery must be "proportional to the needs of the case, considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

Considering all of these factors, the SCO's discovery requests are plainly disproportionate "to the needs of the case." As explained above, Woodlawn does not believe that *any* discovery is necessary to resolve its claims, considering the production of Exhibits 1 and 2 with this Reply. There is no need for the SCO to satisfy its curiousness about *what individual* provided the money that Woodlawn clearly loaned to the Manafort—as spelled out in copious detail in its verified Petition. And even if the Court disagrees with that, why does the SCO need up to *nine depositions*, most or all of which would take place in California, at great expense to Woodlawn? The SCO's request is so preposterous that it suggests bad faith; a desire to punish Woodlawn (for what?) through extremely expensive and burdensome discovery that is plainly not "proportional to the needs of the case."

If the Court still wishes to allow the SCO to pursue this unjustified discovery, it can implement cost-shifting, whereby the part seeking more discovery may be required to pay all or a larger share of the costs. Rule 26(c) was amended in 2015 to expressly authorize entry of a protective order "specifying … the allocation of expenses for particular discovery requests and responses." Rule 26(c)(1)(B). This may be especially effective in cases like this one involving "asymmetrical discovery" where the requesting party seeks substantial discovery from the producing party, but has relatively little information that the requesting party seeks in return. Woodlawn does not seek any information in discovery from the government. *See Zublake v. UBS Warburg*, 217 F.R.D. 309, 317-20 (S.D.N.Y. 2003) (seven factor cost test to implement cost-shifting).

In a normal civil case, the Court may also intervene early to narrow the scope of discovery and limit initial discovery requests and allow subsequent requests only if the initial results warrant further inquiry. That is extremely likely to be the case here. Counsel cannot imagine what the SCO would still need to know, or even want to know, after the first deposition. Of course, a third party ancillary proceeding is not a normal civil case. Fed. R. Crim. P. 32.2(c)(1)(B) expressly gives the Court broad discretion to control what, if any, discovery takes place. The Court should carefully exercise that discretion here to prevent the SCO from using excessive and disproportionate discovery demands to punish Woodlawn for having the temerity to seek summary judgment.

Mr. Claman's Declaration (Doc. 55-2) is quite repetitive. The core of the declaration is in ¶19 where it sums up the "facts and information" the SCO hopes to obtain through its proposed discovery. However, the facts and information it seeks have either already been provided in the Petition and its exhibits, or in attached Exhibits 1 and 2; or they are not material to the issues raised in Woodlawn's Petition and Motion for Summary Judgment, such as "the nature and activities of

Woodlawn LLC" and "the relationship between Woodlawn and Manafort." In any event, counsel takes this opportunity to inform the SCO that there is no relationship between Woodlawn and Manafort other the one created by the arms-length loan itself. As the SCO assumes, Woodlawn was incorporated solely to engage discretely in this loan transaction (five days before the loan agreement was executed) and it has had no other activities. Declaration of Keith Berglund, attached as Exhibit 2.

In sum, the SCO has failed to "outline the particular facts [it] intends to discover and describe why those facts are necessary to the litigation." *Trudel v. SunTrust Bank*, 288 F. Supp. 3d 239, 255 (D.D.C. 2018) (quoting *United States ex rel. Folliard v. Gov't Acquisitions, Inc.,* 764 F.3d 19, 26 (D.C. Cir. 2014).

### 8.      The need for a protective order.

Rule 26(c) of the Federal Rules of Civil Procedure permits the court to issue protective orders to protect a party of person from annoyance, embarrassment, oppression, or undue burden or expense. "Rule 26(c) is highly flexible, having been designed to accommodate all relevant interests as they arise." *United States v. Microsoft Corp.*, 165 F.3d 952, 959 (D.C. Cir. 1999). A typical request for a protective order seeks to prevent the opposing party from obtaining certain information in discovery. Thus, the court needs to balance the moving party's interest in protecting the information against the opposing party's interest in obtaining full discovery. That is not what Woodlawn's request involves. Woodlawn does not seek to prevent the government from obtaining *any* information in discovery (assuming it is entitled to conduct discovery). Rather, it merely seeks to prevent the *general public* from learning the identity of a private person who provided the money that Woodlawn, LLC loaned to the Manaforts.  It does not deprive the government of any information it is otherwise entitled to learn.

"Courts have repeatedly recognized the 'substantial' privacy interest held by 'the targets of law enforcement investigations…in ensuring that their relationship to the investigations remains secret." *People for the Ethical Treatment of Animals v. NIH, HHS*, 745 F.3d 535, 541 (D.C. Cir. 2014) (quoting *Roth*, 642 F.3d at 1174). "We have long recognized… that 'the mention of an individual's name in a law enforcement file will engender comment and speculation and carries a stigmatizing connotation.'" *Ibid*. (quoting *Schrecker*, 349 F.3d at 666). "Indeed, 'there can be no clearer example of an unwarranted invasion of personal privacy than to release to the public that another individual was the subject of a law enforcement investigation." *Id*. at 542 (quoting *Fund for Constitutional Gov't v. Nat'l Archives & Records Serv.*, 656 F.2d 856, 864 (D.C. Cir. 1980)).

The SCO's speculation in its Response that Woodlawn's principal is really none other than Paul Manafort loaning money to himself—that the loan is just a sham—illustrates how persons who are reluctantly engaged in a fight with the SCO (on which Office our Nation's attention has been focused like a laser, as this Court is well aware) have a strong interest in maintaining their privacy and anonymity. If the SCO's speculation was correct, then Woodlawn and everyone associated with it would be guilty of various serious criminal offenses. Woodlawn's principal is effectively a target of a law enforcement investigation now, although he should not be. At the same time, he has been and remains extremely concerned that if his identity is revealed to the public, he will suffer grave damage to his business and personal relationships due to the unpopularity of President Trump and anyone closely associated with the President, such as Paul Manafort, in California, where he lives and does business. Against this strong interest in maintaining his public anonymity, there is little to weigh on the other side of the scale. It is merely the media's idle curiosity to find out who the loan maker is. At present, no one from the press has appeared to

17

oppose Woodlawn's request for a protective order. The Court can weigh such media motions later, if they actually are filed.

<h3 style="text-align:center">Conclusion</h3>

For the reasons stated above and in its Motion for Summary Judgment (Doc. 44), Woodlawn requests that the Court grant its motion for summary judgment, and amend its preliminary order of forfeiture dated October 10, 2018 to recognize Woodlawn's interest in the Baxter Street residence, as set forth in Woodlawn's Second Amended Petition (Corrected) (Doc. 21). There is no need at this time to precisely calculate the amount Woodlawn is owed under its loan agreement. The parties can work that out later; and if they cannot reach an agreement, they can air the remaining calculation issues before the Court.

If the Court decides to grant any discovery to the SCO, it should be sharply limited in scope and accompanied by a requirement to protect the identity of Woodlawn's principal from public disclosure.

Respectfully submitted,

*/s/ David B. Smith*
David B. Smith
D.C. Bar No. 403068
David B. Smith, PLLC
108 North Alfred Street, 1st Floor
Alexandria, Virginia 22314
(703) 548-8911
Facsimile (703) 548-8935
dbs@davidbsmithpllc.com
*Counsel for Woodlawn, LLC*

**<u>Certificate of Service</u>**

I hereby certify that on the 4th day of April, 2019, I electronically filed the foregoing document and exhibits with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to the following CM/ECF user(s):

> Andrew Weissmann
> U.S. Department of Justice
> Special Counsel's Office
> 950 Pennsylvania Avenue, N.W.
> Washington, D.C. 20530
> aaw@usdoj.gov
>
> Daniel H. Claman
> U.S. Department of Justice, Criminal Division
> Money Laundering and Asset Recovery Section
> 1400 New York Avenue, N.W.
> Suite 10200
> Washington, D.C. 20530
> daniel.claman@usdoj.gov

And I hereby certify that I have mailed the document by United States mail, first class postage prepaid, to the following non-CM/ECF participant(s), addressed as follows: [none].

> */s/ David B. Smith*
> David B. Smith
> D.C. Bar No. 403068
> David B. Smith, PLLC
> 108 North Alfred Street, 1st Floor
> Alexandria, Virginia 22314
> (703) 548-8911
> Facsimile (703) 548-8935
> dbs@davidbsmithpllc.com
> *Counsel for Woodlawn, LLC*