UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

)
)
In Re: PETITIONS FOR RELIEF       )
CONCERNING CONSENT                )   Misc. Action No. 18-0167 (ABJ)
ORDER OF FORFEITURE               )
)
)

# ORDER

This miscellaneous matter involves the order of forfeiture entered in the criminal matter of defendant Paul J. Manafort, Jr. Manafort voluntarily forfeited certain property to the government as part of his guilty plea in *United States v. Manafort*, Crim. Action No. 17-0201-01 (ABJ),[1] and a number of lenders and lien holders have filed petitions in this ancillary proceeding asserting interests in the forfeited properties.

## BACKGROUND

This order concerns petitions filed by a bank, The Federal Savings Bank ("TFSB" or "the Bank"), and its holding company National Bancorp Holdings, Inc. ("Bancorp"). *See* Pet. of TSFB for Ancillary Hearing [Dkt. # 8] ("TFSB Pet."); Pet. of Nat'l Bancorp Holdings, Inc. for Ancillary Hearing [Dkt. # 9] ("Bancorp Pet."). TSFB is a "federal savings bank," TFSB Pet. at 1, and Bancorp "is a savings and loan holding company," which "owns 100% of the [TFSB] and all of

---

1  *See United States v. Manafort*, Crim. Action No. 17-0201-01 (ABJ), Consent Order of Forfeiture [Cr. Dkt. # 443]. The Consent Order of Forfeiture is also docketed in this miscellaneous matter. *See* Consent Order of Forfeiture [Dkt. # 3]. Documents appearing on the docket of the criminal matter will be cited using "[Cr. Dkt. # __]." The Court entered a revised order on March 13, 2019. Order of Forfeiture [Cr. Dkt. # 549].

1

its liens." Bancorp Pet. ¶ 2. Their parallel petitions assert claims arising from the same loans secured by three properties that Manafort forfeited:

- real property located at 174 Jobs Lane, Water Mill, New York 11976 ("the Jobs Lane property"),

- real property located at 377 Union Street, Brooklyn, New York l1231 ("the Union Street property"), and

- all funds in account number XXXXXX0969 held at the TFSB ("the Account").

TFSB Pet. ¶ 1; Bancorp Pet. ¶ 1. Petitioners' claims arise from three loans the Bank made to Manafort.

## I. The 2016 Summerbreeze Loan Secured by the Jobs Lane Property

Petitioners assert that on or about November 16, 2016, the Bank entered into a loan agreement with defendant Manafort, his wife Kathleen B. Manafort, and Summerbreeze LLC, a New York limited liability company, for $9.5 million dollars. TFSB Pet. ¶ 2; Adjustable Rate Note, Ex. A to TFSB Pet. [Dkt. # 8-1]; Bancorp Pet. ¶ 3; Adjustable Rate Note, Ex. A to Bancorp Pet. [Dkt. # 9-1] ("Summerbreeze Note").[2] TFSB disbursed $9,463,597.67 to the borrowers in accordance with the Summerbreeze Note. TFSB Pet. ¶ 2; Bancorp Pet. ¶ 3.

The loan was secured by a mortgage on the Jobs Lane property,[3] recorded on December 9, 2016. TFSB Pet. ¶ 3; Mortgage, Ex. B to TFSB Pet. [Dkt. # 8-2]; Bancorp Pet. ¶ 4; Mortgage, Ex. B to Bancorp Pet. [Dkt. # 9-2] ("Summerbreeze Mortgage"). The loan documents indicate

---

2  Under the terms of the note, the thirty-year loan would mature on December 1, 2046 and had an interest rate of 7.25% through December 2019, adjustable thereafter to one year LIBOR plus 5.00%. TFSB Pet. ¶ 2; Bancorp Pet. ¶ 3.

3  The note lists 174 Jobs Lane as being in Bridgehampton, New York, not Water Mill, New York, as it is identified in the petitions. *Compare* 2016 Summerbreeze Note at 1 *with* TFSB Pet. ¶ 1 and Bancorp Pet. ¶ 1.

that the loan was further secured by other collateral: a deposit account valued at $630,000 and another piece of real estate in Alexandria, Virginia, the value of which is not listed in the loan agreement. *See* Summerbreeze Mortgage at 4; Summerbreeze Note at 1.

II.     **The 2017 Manafort Loans Secured by the Union Street Property and the Account**

On or about January 4, 2017, the Bank entered into two additional loan agreements with Manafort and his wife, for $5.3 million and $1.2 million, respectively. TFSB Pet. ¶ 6; Bancorp Pet. ¶ 7. The borrowers executed two promissory notes. *See* Project Loan Note, Ex. C to TFSB Pet. [Dkt. # 8-3]; Ex. C to Bancorp Pet. [Dkt. # 9-3]; Building Loan Note, Ex. D to TFSB Pet. [Dkt. # 8-4]; Ex. D to Bancorp Pet. [Dkt. # 9-4]. On or about January 4, 2017, the Bank disbursed $5.3 million to the borrowers pursuant to the $5.3 million note, and to date, has disbursed $624,305.72 under the $1.2 million note. TFSB Pet. ¶ 6; Bancorp Pet. ¶ 7. Both loans had interest rates of 7.25% and matured on January 4, 2018. TFSB Pet. ¶ 6; Bancorp Pet. ¶ 10.

The 2017 loans were secured by two mortgages dated January 17, 2017 on the Union Street property: one for $5.3 million and the other for $1.2 million. TFSB Pet. ¶ 7; Project Loan Mortgage, Ex. E to TFSB Pet. [Dkt. # 8-5], Ex. E to Bancorp Pet. [Dkt. # 9-5]; Building Loan Mortgage, Ex. F to TFSB Pet. [Dkt. # 8-6], Ex. F to Bancorp Pet. [Dkt. # 9-6]. They were further secured by approximately $2.5 million in funds held in the Account at the Bank, pursuant to a Deposit Account and Security Agreement dated January 4, 2017. TFSB Pet. ¶ 8.; Ex. G to TFSB Pet. [Dkt. # 8-7], Ex. G to Bancorp Pet. [Dkt. # 9-7].

Bancorp owns 100% of TFSB, Bancorp Pet. ¶ 2, and accordingly, filed claims identical to TFSB's for the three assets in question. Further, it purchased a $3 million "undivided participating ownership interest (57%) in the $5.3 million loan" *id*. ¶ 8, and a "$1.2 million undivided

participating ownership interest in the $1.2 million loan," id. ¶ 9, so it does not assert that it previously gained an interest in the Jobs Lane property or the $9.5 million loan. See id. ¶ 3.

### III. The Criminal Matter and Order of Forfeiture

Defendant Manafort was indicted on October 27, 2017, on charges of money laundering, tax fraud, failing to file Foreign Bank Account Reports, and failing to register under the Foreign Agents Registration Act. Indictment [Cr. Dkt. ## 1, 13].[4] Since November 1, 2017, the borrowers have been in default on the Summerbreeze loan, owing more than $10.66 million in principal, interest, fees and insurance. TFSB Pet. ¶¶ 4–5. The borrowers have also been in default on the 2017 notes since November 1, 2017, owing more than $6.7 million in principal, interest, fees, and insurance. Id. ¶¶ 9–10.

Superseding indictments against Manafort were filed on February 16, 2018, and June 8, 2018. Superseding Indictment of Feb. 23, 2018 [Cr. Dkt. # 202] ("Feb. 23 Superseding Indictment"); Superseding Indictment of June 8, 2018 [Cr. Dkt. # 318] ("June 8 Superseding Indictment"). Both alleged that the three properties in question were subject to forfeiture. Feb. 23 Superseding Indictment ¶ 49; June 8 Superseding Indictment ¶ 52.

On September 14, 2018, Manafort entered a guilty plea in the criminal matter before this Court. Plea Agreement [Cr. Dkt. # 422]. As part of the plea agreement, he agreed to forfeit certain property, including the three properties in question in this case. Plea Agreement ¶ 12(1), (3), (4).

On October 10, 2018, the Court entered a Consent Order of Forfeiture, finding that the Jobs Lane property, the Union Street property, and the Account, among other assets, were

---

4     Manafort was also charged and convicted in a separate criminal proceeding in the Eastern District of Virginia for tax evasion, failing to file foreign bank account reports, and bank fraud. *United States v. Manafort*, Criminal Action No. 1:18-cr-83, Judgment [Dkt. # 326].

forfeitable as proceeds of his criminal activities. Consent Order of Forfeiture at 2. On March 13, 2019, it entered a revised order of forfeiture, ordering that specific property, including the three properties at issue here, would be forfeited and adding a money judgment against the defendant. Order of Forfeiture [Cr. Dkt. # 549] at 4–5.

## PROCEDURAL HISTORY

On November 15, 2018, the petitioners filed parallel petitions requesting hearings pursuant to 21 U.S.C. § 853(n)(5) to establish their claims to the forfeited property, and for the Court to amend its order of forfeiture as to the Jobs Lane property, the Union Street property, and the Account. TFSB Pet. at 1; Bancorp Pet. at 1. They assert that they have a prior vested or superior interest in the forfeited assets, arguing that "the indictments against Mr. Manafort (and the forfeiture allegations contained therein regarding those pieces of property) were brought long after those pieces of property were pledged to the Bank as collateral in support of the loans." TFSB Pet. ¶ 11; Bancorp Pet. ¶ 15. Alternatively, they argue that they are bona fide purchasers for value of the interests they claim in the assets because they were "at the time of the loan transactions reasonably without cause to believe that the property was subject to forfeiture." TFSB Pet. ¶ 11; Bancorp Pet. ¶ 15. The Bank asserts that when it extended these loans to Manafort, it "had no knowledge and no reason to know that Mr. Manafort had acquired any of that collateral as a result of his having engaged in any criminal activity, including a conspiracy to commit money laundering, tax fraud, FARA violations, or obstruct justice." TFSB Pet. ¶ 14; *see also* Bancorp Pet. ¶ 18 (asserting the same regarding the Bank's knowledge and that Bancorp is an innocent owner of the Bank and all of its liens). Both maintain that they were victims of Manafort's fraud. TFSB Pet. ¶ 14; Bancorp Pet. ¶ 18.

On December 13, 2019, the government filed a motion for discovery. United States' Mot. for Disc. under Fed. R. Crim. P. 32.2(c)(1)(B) Concerning Petitions of the Federal Savings Bank and National Bancorp Holdings, Inc. [Dkt. # 95] ("Gov't Mot."); United States' Mem. of P. & A. in Supp. of Gov't Mot. [Dkt. # 95-1]. The petitioners opposed the motion, Pet'rs' Mem. of P. & A. in Opp. to Gov't Mot. for Disc. [Dkt. # 100] ("Opp."), and the government replied. Gov't Reply in Supp. of Gov't Mot. [Dkt. # 103] ("Gov't Reply").

For the following reasons, the Court will grant the government's motion.

## LEGAL FRAMEWORK

Federal criminal forfeitures are governed by 21 U.S.C. § 853 and Federal Rule of Criminal Procedure 32.2(c)(1)(B). Property constituting or derived from criminal activity punishable by imprisonment of more than one year is subject to criminal forfeiture pursuant to 21 U.S.C. § 853(a)(1). The government's right to property under this provision vests "upon the commission of the act giving rise" to the forfeiture, and section 853 authorizes courts to order such property to be forfeited to the government. *Id*. §§ 853(c), (a)(3). Anyone "other than the defendant" who has an interest in property forfeited under section 853 may file a petition for a hearing to adjudicate the validity of its interest in the property. *Id.* § 853(n)(2). The petitioner bears the burden of proof by a preponderance of the evidence that it either has a superior right to the property or is a bona fide purchaser. *Id.* § 853(n)(6).

Section 853 is the only means for adjudicating third-party claims with respect to forfeited property in criminal cases, and Federal Rule of Criminal Procedure 32.2(c) sets forth the procedures that govern hearings held pursuant to section 853(n). *See* Fed. R. Crim. P. 32.2(c) (referring to these hearings as "ancillary proceedings"). To qualify as a third party under section 853, a petitioner must establish standing. *United States v. Emor*, 785 F.3d 671, 676

(D.C. Cir. 2015).  Further, to successfully challenge a forfeiture, the petitioner must show by a preponderance of the evidence that it "has a legal right, title, or interest in the property," 21 U.S.C. § 853(n)(6)(A), or "the petitioner is a bona fide purchaser" of the property, *id.* § 853(n)(6)(B), "without cause to believe that the property was subject to forfeiture." *Id.* § 853(c).

A court may order discovery in these ancillary proceedings if it determines that discovery is "necessary or desirable" to resolve factual issues.  Fed. R. Crim. P. 32.2(c)(1)(B) (stating that discovery is to be conducted in accordance with the Federal Rules of Civil Procedure).  An "ancillary proceeding 'does not involve relitigation of the forfeitability of the property; its only purpose is to determine whether any third party has a legal interest in the forfeited property.'" *Sunrise Acad. v. United States*, 791 F. Supp. 2d 200, 203 (D.D.C. 2011), quoting Fed. R. Crim. P. 32.2 advisory committee note (2000 adoption).  In an ancillary proceeding, "the burden shifts to the petitioner to establish 'the petitioner's third-party claim by a preponderance of the evidence.'" *United States v. Coffman*, 612 F. App'x 278, 284 (6th Cir. 2015), quoting *United States v. Salti*, 579 F.3d 656, 661 (6th Cir. 2009).  "Congress chose to place the burden of proof on the third-party during the ancillary proceeding, since the government would necessarily have carried its burden of proving that the defendant's interest in the property was subject to forfeiture during the criminal trial." *United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001), *superseded on other grounds* as recognized in *United States v. Marion*, 562 F.3d 1330 (11th Cir. 2009).

**ANALYSIS**

The government requests discovery to enable it and the Court to determine the facts underlying the claims asserted in the two petitions, including what the petitioners knew about defendant's criminal conduct when they made the loans, their relationship with defendant, whether the loans were an effort to dissipate the proceeds of his crimes, and the validity and extent of their

asserted interests. Gov't Reply at 1–3. The petitioners argue that the transcript of defendant's criminal trial in the Eastern District of Virginia provides the Court the facts it needs to analyze their claims, so discovery is not necessary or desirable. Opp. at 2, 5.

A central issue in determining the merits of the pending petitions is what the petitioners knew about the Manafort's activities at the time they made the loans. *See* 21 U.S.C. § 853(n)(6)(B). Petitioners urge the Court to rely on the record of defendant's trial in the Eastern District of Virginia in deciding their claims, but the record of that trial does not fully address the knowledge and intent of the entities that are the petitioners. Some individual bank employees did testify as fact witnesses, but their testimony was not offered or received on behalf of either institution. *See United States v. Manafort*, Criminal Action No. 1:18-cr-83, Tr. of Jury Trial (Aug. 10, 2018) [Dkt. # 243] ("Trial Tr. of Aug. 10") (testimony of a former TFSB senior vice president and of TFSB's chief operating officer of home lending); *id.*, Tr. of Jury Trial (Aug. 13, 2018) [Dkt. # 282] ("Trial Tr. of Aug. 13") (testimony of a TFSB vice president).

Further, key officials did not testify – including the chief executive officer and chairman of the board of both TFSB and Bancorp, Stephen Calk. Bank employees testified under oath that he was directly involved in negotiating the loans, he pushed to expedite them, and he was ultimately responsible for approving them despite red flags in defendant's application. *See* Trial Tr. of Aug. 10 at 2014–15; Trial Tr. of Aug. 13 at 2247–48. Since that time, Calk has been indicted and is awaiting trial in the Southern District of New York on financial bribery charges. *See United States v. Stephen M. Calk*, 19 Cr. 366 (LGS) (S.D.N.Y.), Indictment [Dkt. # 2] (charging that between July 2016 and January 2017, Calk abused his authority as chairman and CEO of the Bank "to issue millions of dollars in high-risk loans" with the expectation that the borrower, who "from

June 2016 through August 2016, . . . served as chairman of the Presidential Campaign" would assist him in obtaining a job in the administration).

These circumstances provide additional reasons why discovery is likely to illuminate whether petitioners were "reasonably without cause to believe that the property was subject to forfeiture," 21 U.S.C. § 853(n)(6)(B), and support the conclusion that the proposed discovery is relevant to the parties' claims pursuant to Federal Rule of Civil Procedure 26. The Court finds in its discretion that discovery is desirable to resolve the circumstances surrounding the Bank's acquisition of its interest in the properties, which are relevant to the petitioners' standing and status as bona fide purchasers under 21 U.S.C. § 853(n)(6)(B).

Petitioners also claim that they have a superior interest to the properties under 21 U.S.C. § 853(n)(6)(A), arguing that the properties were forfeited as substitute assets, not specific assets. Opp. at 7–9 (emphasizing that the Consent Order of Forfeiture lists alternative bases for forfeiture). But the Court's final order plainly states that "[t]he following *specific* property is forfeited to the United States, . . . including a) The real property and premises commonly known as 377 Union Street . . . c) The real property and premises commonly known as 174 Jobs Lane . . . , [and] d) All funds held in account number XXXXXX:0969 at The Federal Savings Bank . . . ." Order of Forfeiture [Cr. Dkt. # 549] at 5 (emphasis added). The fact that the order provides the forfeited assets can "alternatively . . . be forfeited as Substitute Property," *id.* at 2, does not undermine the Court's finding that these three properties, among others, were specifically forfeited. *See also id.* at 2 (stating that "in his plea agreement, the defendant . . . agreed, *inter alia,* such property constitutes or is derived from proceeds traceable to the conspiracy to violate FARA offense alleged in Count One" for which he was convicted); *see also id*. at 3 (identifying two other assets not at issue here as "Substitute Property").

Petitioners further argue that their interests are superior to the government's because "TFSB obtained its mortgages on the Collateral Properties in November 2016 and January 2017,

long before Mr. Manafort was indicted . . . on October 27, 2017." Opp. at 14.  But a TFSB vice president, reading from an internal loan memorandum he had authored before the Summerbreeze loan was approved, testified that he had concerns at the time that "Manafort's past lobbying efforts with foreign governments might be investigated in the future."  Trial Tr. of Aug. 13 at 2229–30.  Indeed, when the Bank was considering defendant's loan applications, it was widely reported in the press that Manafort had failed to register as a foreign agent for his work with Ukraine.[5]  So while it is true that the loans were issued before Manafort was publicly charged with any crimes, there are legitimate questions about what was known about potential or pending investigations at the time, and the record as it stands now does not put those issues to rest.

In any event, even if petitioners' interests are valid, the current record in this case does not demonstrate the extent of those interests.  The 2016 Summerbreeze loan appears to have been secured not only by the Jobs Lane property, but also by two additional properties, *see* Summerbreeze Mortgage at 4; Summerbreeze Note at 1, on which the Bank may have already foreclosed and recouped some of its loss.  *See* Opp. at 21.  As for the 2017 loans, TFSB sold $3 million of the $5.3 million loan and all of the $1.2 million loan to Bancorp, Bancorp Pet. ¶¶ 8–

---

5       *See* Molly Hennessy-Fiske, Seema Mehta, & Noah Bierman, *Trump reboots amid turmoil Efforts to broaden appeal come with campaign shake-up*, Chicago Tribune, 2016 WLNR 25433720 (Aug. 20, 2016); Jeff Horwitz & Chad Day, Associated Press, *Trump advisers waged covert influence campaign*, Chicago Daily Herald (Aug. 19, 2016, 7:00 AM), https://www.dailyherald.com/article/20160819/news/308199971/; Maggie Haberman & Jonathan Martin, *Paul Manafort Quits Donald Trump's Campaign After a Tumultuous Run*, New York Times (Aug. 19, 2016), https://www.nytimes.com/2016/08/20/us/politics/paul-manafort-resigns-donald-trump.html; Jeff Horwitz & Desmond Butler, *AP Sources: Manafort tied to undisclosed foreign lobbying,* The Associated Press (Aug. 17, 2016), https://apnews.com/c01989a47ee5421593ba1b301ec07813; Tom Hamburger, Dana Priest, & Andrew Roth, *How Trump adviser Manafort revived his career – and business fortunes – in Ukraine*, Washington Post (Aug. 18, 2016), https://www.washingtonpost.com/politics/how-trump-adviser-manafort-revived-his-career--and-business-fortunes--in-ukraine/2016/08/18/8bcfb144-648f-11e6-be4e-23fc4d4d12b4_story.html.

9, so it is not clear how each petitioner can assert an interest for all of the collateral securing these loans.  Discovery is necessary to determine the nature and extent of each petitioner's interest in the assets.

Finally, petitioners argue that discovery is merely a stalling tactic given the government's request to delay some of the discovery it seeks until after Calk's trial has concluded.  Opp. at 23.  They argue that if discovery is granted, an "indefinite stay" will result.  *Id.* at 5.  The Court finds that petitioners will not be prejudiced by any delay since their claimed interest in the property will be unaffected in the meantime.  Moreover, Calk's trial is inexorably linked with petitioners' claims so any resulting delay is warranted, and the trial may not cause the "indefinite stay" that petitioners fear in any event because it is set to begin on September 3.  *See United States v. Stephen M. Calk*, 19 Cr. 366 (LGS), Scheduling Order [Dkt. # 72].  But while the Court will permit the government to await the outcome of the trial to complete its inquires, particularly with respect to Calk, it can and should initiate paper discovery from other individuals and entities in the meantime, and it may depose other individuals as well.

Therefore, upon consideration of the United States' Motion for Discovery Under Federal Rule of Criminal Procedure 32.2(c)(1)(B) Concerning Petitions of TFSB and Bancorp, Inc. and pursuant to Fed. R. Crim. P. 32.2(c)(1)(B) [Dkt. # 95], the Court finds that discovery is necessary and desirable under Rule 32.2(c)(1)(B) and the motion is GRANTED.  It is ORDERED that the government may propound or take the following discovery:

1. The facts, defenses, and standing of TFSB and/or Bancorp with respect to its petition in this action.
2. The ownership, management, and structure of TFSB and Bancorp.
3. The procedures, policies, and practices of TFSB, Bancorp, and their officers, employees or owners for receiving, soliciting, preparing, reviewing, approving or denying loans or client relationships.

4. Any relationship and contact TFSB, Bancorp, and/or their officers, employees or owners has or has had directly or indirectly with Defendant Paul J. Manafort, Jr., his associates, relatives, representatives, and related entities.

5. The nature and extent of the interest TFSB and/or Bancorp has or has had in any asset forfeited in this action or any actual or proposed loan, lien, note, collateral, consideration or obligations involving Defendant Paul J. Manafort, Jr., his associates, relatives, representatives, and related entities.

6. Any facts, circumstances, procedures, or actions relating to any asset forfeited in this action or any actual or proposed loan, lien, note, collateral, consideration or obligations involving Defendant Paul J. Manafort, Jr., his associates, relatives, representatives, and related entities.

7. Information available to or within the knowledge of TFSB, Bancorp, and and/or any such company's officers, employees, owners concerning the conduct or assets of Paul J. Manafort, Jr., his associates, relatives, representatives, and related entities.

It is FURTHER ORDERED that pursuant to Fed. R. Crim. P. 32.2, the United States may conduct discovery in accordance with the Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions for the purposes set forth above.

It is FURTHER ORDERED that the United States may begin to conduct document discovery upon entry of this Order, and that the government shall file a status report by June 30, 2020 informing the Court of any updates concerning the timing of the trial in *United States v. Stephen M. Calk*, 19 Cr. 366 (LGS) (S.D.N.Y.), and specifying what discovery, aside from the deposition of Calk, needs to await the end of that trial.

It is FURTHER ORDERED that counsel are required to confer in good faith in an effort to resolve all discovery disputes before bringing any dispute to the Court. If counsel have conferred about the specific matter in dispute and agree that they cannot resolve the issue themselves, counsel may contact chambers to arrange a telephone conference with the Court and propose times that are convenient to both sides. **No written discovery motion may be filed without a prior conference**

**with the Court and leave of Court.**  With respect to depositions, the Court expects that counsel will endeavor in good faith to resolve disputes among themselves, and it cautions that while appropriate objections may be noted for the record, no lawyer may instruct a witness not to answer a question unless the question calls for the revelation of privileged material.  Disputes brought to the Court for resolution may be subject to the sanctions provisions set forth in Federal Rule of Civil Procedure 37 and Local Civil Rule 26.2(a).

This ruling should not be taken as expressing any views on the merits of either party's claim.

**SO ORDERED**.

AMY BERMAN JACKSON
United States District Judge

DATE:  May 26, 2020